REPUBLIC INSURANCE COMPANY V. HIGHLAND PARK INDEPENDENT SCHOOL DISTRICT OF DALLAS COUNTY ET AL.

No. 6929. Decided January 20, 1937.
Rehearing overruled March 3, 1937.
(102 S. W., 2d Series, 184.)

56

*Smithdeal, Shook, Spence & Bowyer,* of Dallas, for plaintiff in error.

Since the amount of every prepaid and unearned fire insurance premium held by a fire insurance company at any time is an absolute and just debt, payable to the policyholder on demand, such amount is constitutionally deductible from the property of the company in arriving at the valuation of its property which is subject to taxation. Texas Employers Ins. Assn. v. City of Dallas, 5 S. W. (2d) 614; Griffin, Tax Collector, v. Heard, Allen & Floore, 78 Texas 607, 14 S. W. 892; Taylor v. Robinson, 72 Texas 364, 10 S. W. 245; Smith v. Patterson, 111 Texas 535, 242 S. W. 749.

The action of the board of equalization, in the absence of fraud, is final. 37 Cyc. 1108; 3 Cooley on Taxation, 2400; Moody v. City of Galveston, 50 S. W. 481 (error refused) ; Cobb v. Downing, 1 S. W. (2d) 508.

The insurance company having listed, inventoried, and valued all of its taxable personal property and from this sought in good faith to make certain deductions, there was no omitted or unrendered property, and there was no resulting right of the tax assessor to assess any omitted or unrendered property. Commonwealth of Virginia v. Chesapeake & Ohio Ry. Co., 137 Va. 526, 120 S. E. 506; 61 C. J. 795.

*R. M. Vaughan, Bell, Goode & Howard, Clark & Vaughan, Purl & Lewis,* all of Dallas, and *Greenwood, Moody & Robertson,* of Austin, for defendants in error.

Money and property of a fire insurance company designed as "reserve" is taxable and Article 5057a attempting to exempt it from taxes is void because there is a distinction between life insurance policy reserve and fire insurance premium reserve. City of Waco v. Amicable Life Ins. Co., 248 S. W. 332; National Surety Co. v. Fietner, 166 N. Y. 129, 59 N. E. 731; Trenton v. Standard Fire Ins. Co., 76 N. J. L. 79, 68 Atl. 1111.

*Wm. McCraw,* Attorney General, and *W. W. Heath,* Assistant Attorney General, for L. A. Woods, State Superintendent of Schools, *Robert L. Hurt,* District Attorney and *W. Floyd Clark,* Assistant District Attorney for Dallas County, *Will R. Parker,* District Attorney and *Cecil C. Rotsch,* Assistant District Attorney of Tarrant County, *R. E. Rouer,* City Attorney of Fort Worth, *Robt. M. Rowland,* for Fort Worth Independent School

District, *W. K. Sampson,* County Attorney, Decatur, Wise County, *Felix Atwood,* City Attorney of Ennis, *John J. Fagan,* of Dallas, for other taxing units, and *J. W. Gormley,* of Dallas, filed briefs as amici curiae.

MR. JUDGE GERMAN, of the Commission of Appeals, delivered the opinion for the Court.

Plaintiff in error, Republic Insurance Company, is incorporated under the laws of the State of Texas, and is engaged in the business of writing fire and casualty insurance. It has its office and principal place of business within the Highland Park Independent School District, Dallas County, Texas. It will be designated plaintiff. The real defendant in error is the Highland Park Independent School District. It will be. referred to as defendant.

On March 28, 1933, plaintiff prepared a rendition of all property which it claimed was subject to taxation in said school district for the year 1933, verified same by proper oath, and delivered it to C. H. Hickox, the then duly appointed, qualified and acting tax assessor of said district. The tax assessor promptly acknowledged receipt of this rendition, but took no action thereon as provided by Article 7211 of the Revised Statutes of 1925, except as may hereinafter be indicated. The rendition apparently went to the duly appointed board of equalization of the school. district, because that board met and organized early in August, 1933, and sent a notice to plaintiff to appear and show cause why the valuation of its property should not be raised. The board disposed of all of its business of equalizing valuations prior to August 28, 1933, except the rendition of plaintiff of its personal property, and the rendition of two other parties. The board met on August 28, 1933, for the purpose of discussing the rendition of plaintiff of its personal property, and for the purpose of equalizing the assessments of the two other parties. These two assessments were promptly disposed of, and the hearing centered upon the rendition of plaintiff.

It is appropriate to state here that the controversy involved in this proceeding is of long standing, and concerns mainly the right of plaintiff to deduct from the valuation of its personal property its legal reserve, as provided by what is known as Article 5057a of Vernon's Annotated Texas Civil Statutes, being Chapter 190 of the Acts of the 40th Legislature passed in 1927. In the last analysis the complaint of the school district mainly is that plaintiff should not have been permitted to deduct from the value of its personal property the sum of $1,834,273.98

as items of reserve, and should not have been permitted to deduct the sum of $402,671.87 in United States tax free bonds, which bonds the district claims were fraudulently purchased on December 28, 1932, for the purpose of evading taxation.

Prior to the date of the meeting on August 28, 1933, the defendant school district, being dissatisfied with the rendition of plaintiff, employed attorneys for the purpose of attempting to contest the rendition, or to get it corrected and supplemented in such way as to include property which plaintiff had deducted, being principally the items above mentioned. To this end, the attorneys procured a copy of the annual statement made by the plaintiff to the Board of Insurance Commissioners of the State of Texas for the year ending December 31, 1932,. and from this report made up a statement of all assets of the company shown thereon, together with the values attached thereto in said report, including the various items of reserve which had been deducted from the rendition made by plaintiff, and the United States bonds. The statement as thus prepared showed a value of property rendered by plaintiff far in excess of the value placed thereon in the rendition as the taxable value, and included items which had been deducted by plaintiff from the rendition, being the items above mentioned. The statement thus prepared showed a valuation of more than $2,000,000, including reserves deducted by plaintiff, and a valuation of some $600,000, excluding reserves, which the district claimed should be taxed. The statement thus prepared and bearing date August 25, 1933, was attached to the rendition made by plaintiff and bore the signature of the tax assessor. No notice of an attempt to increase valuations as provided for in Article 7211 of the Revised Statutes, or to make a return of unrendered property, was given by the assessor to the plaintiff, and prior to the hearing plaintiff had been given no opportunity to file controverting oath as provided by Article 7211. At the meeting held on August 28, 1933, the purported action of the tax assessor, as contained in the statement mentioned, was brought to the attention of the board of equalization for the first time. The presiding member of the board thereupon caused the tax assessor to be placed under oath and he was questioned concerning the statement. The tax assessor disavowed it as his official act, and admitted that the items of property listed in the statement, as well as the purported values, were taken from the report filed with the Board of Insurance Commissioners as of date December 31, 1932, and did not constitute an official recommendation or estimation of values on his part, as provided for in Article 7211, and did not in any manner constitute his official act. His

repudiation of this statement as an official act was complete; or at least was sufficient to justify the board of equalization in treating it as complete. Acting upon the statements made by the tax assessor the board disregarded the purported statement and proceeded upon the theory that it had nothing before it except the formal rendition made by plaintiff. Although the rendition as returned and verified showed no personal property subject to taxation, nevertheless the board affixed a valuation upon the rendition of personal property of $330,760.65. Under the admitted custom of fixing taxable values at 65 per cent. of the estimated values, the board fixed the taxable value at $215,000.00, approved the assesment and closed its meeting.

Plaintiff accepted the valuation fixed by the board. Thereafter the defendant, acting by its board of trustees, attempted to discharge the tax assessor and to appoint another one in his stead. It also attempted to discharge the board of equalization and to appoint other members in their stead. It thereupon sought to renew the controversy concerning the rendition by plaintiff, although the action of the board in all other respects had been accepted. This new board organized and set a day in October, 1933, for a hearing. The newly appointed assessor attempted to amend or supplement the rendition made by plaintiff in exactly the same manner as had theretofore been attempted. Plaintiff thereupon filed this proceeding in the district court of Dallas County, seeking an injunction to restrain defendant school district, its trustees and the newly appointed assessor and equalization board from proceeding further, claiming that the action of the original board was final and conclusive. The district court, after withdrawing the case from the jury, rendered judgment in favor of plaintiff, restraining the district and its officials from proceeding further in the attempt to revise the rendition made by plaintiff and to reassess its property. The court also issued a mandamus requiring the acceptance of taxes tendered by plaintiff on the basis of the assessment of $215,000.00 made by the board of equalization on August 28, 1933. The Court of Civil Appeals reversed the judgment of the trial court and rendered judgment in favor of the school district, dissolving the injunction and vacating the mandamus. This action of the court was based on a holding that the assessment by the board of equalization on August 28, 1933, was void, because arbitrarily taken without hearing proof, and because the statute authorizing plaintiff to deduct its legal reserve was unconstitutional and void. 80 S. W. (2d) 1053. Chief Justice JONES dissented on the question of the unconstitutionality of the statute.

**1** We are of the opinion that the Court of Civil Appeals erred in holding that the action of the board of equalization on August 28, 1933, was void. Both members of the board who sat at the hearing testified that the tax assessor appeared before them and under oath absolutely disavowed the statement of August 25, 1933, attached to plaintiff's rendition, as his official act, either as an attempt to change values, as provided for by Article 7211, or as an attempt to assess unrendered property, as provided by other articles of the statute. This testimony was undisputed, and undoubtedly was sufficient to justify a finding on the part of the board that no official action had been taken or recommended by the tax assessor. In addition Article 7211 requires the tax assessor, if he be dissatisfied with the values fixed by the owner to *at once* place on the rendition his estimated values. This article further contemplates notice to the owner, or at least an opportunity to controvert the values fixed by the assessor prior to the time the rendition is referred to the board of equalization. The failure of the assessor to act prior to August 25, 1933, and to give notice, was sufficient to justify the board in declining to be bound by the statement as an official act.

**2-4** It is well settled that when a rendition has been made by a property owner in the statutory manner, under oath, and accepted by the tax assessor without such action as is provided by Article 7211, it is prima facie a correct rendition. Even when the board itself is dissatisfied with the values fixed by the owner and gives notice of a raise, if at a hearing it adopts some arbitrary standard of valuation, or refuses to hear proof, or fails to adduce proof upon its own motion, so that an illegal value is fixed, the rendition made by the owner prevails and becomes the basis upon which taxes are to be paid. State v. Richardson, 84 S. W. (2d) 1076, and authorities cited. The duties of the tax assessor, if he be dissatisfied with the rendition, are clearly prescribed by statute. In principle, the question here involved was decided in the case of Republic Insurance Co. v. Highland Park Independent School District, 57 S. W. (2d) 627. As the assessor failed to bring the matter before the board as provided in Article 7211 and failed to proceed as provided by Article 7208 and Article 7218, the rendition made by plaintiff was the only thing before the board and its duty was prescribed by Article 7212. The board had no authority to declare Article 5057a unconstitutional, but was bound to regard it and to allow a deduction of the reserve mentioned in said article. Nor did the board under the circumstances have a right to disallow a deduction of the United States bonds. They were

prima facie not taxable. From the discussion hereinafter set out it will be seen that the controversy concerning these bonds was determined by the board, and its action in that respect, as well as upon all questions of value, was final.

5 It does not follow, however, that if the board allowed a deduction of the reserve, or even if it made a mistake in allowing a deduction of items as reserve in excess of that permitted by Article 5057a to be deducted, these items, if legally taxable, would escape taxation. If the reserves claimed by plaintiff were illegally deducted, the result was exactly the same as if they had never been rendered at all. They would constitute unrendered property, and Articles 7208 and 7218 immediately became applicable to them, and furnished a proper method of subjecting them to taxation. The rendition and the action of the board thereon in all other respects was unquestionably final. State v. Chicago R. I. & G. Ry. Co., (Com. App.) 263 S. W. 249; Ramey v. City of Tyler, 45 S. W. (2d) 359.

6 The defendant contends that it was attempting by the appointment of a new assessor and a new board of equalization to reach the reserves and the United States bonds and subject them to taxation as unrendered property under Articles 7208 and 7218, and as the statute allowing a deduction of legal reserves is unconstitutional and void, and there was an issue of fact concerning the fraudulent purchase of the United States bonds, the trial court erroneously granted its injunction. Without any elaborate discussion of the matter, we state it as our opinion that the attempted action of the trustees in discharging the assessor and the board of equalization, manifestly because they had gone contrary to the wishes of the trustees as concerns this particular transaction, in order to appoint another assessor and another board, and thus be able to accomplish the purpose of the district in the matter of assessing for taxation the property in dispute, was void. The underlying principle which suggests the necessity for a tax assessor and a board of equalization is that they shall be free, impartial and independent persons, intrusted with the duty of protecting alike the rights of the taxing authority and the taxpayer. If trustees possessed the right to discharge at will either a tax assessor or a board of equalization, a condition would exist which would make these officials subject to the will of the trustees. If a board of equalization may be changed at the will or whim of the board of trustees, "its independence and stability is gone, and it becomes a mere servile tool or agent" of the board of trustees. In view of the finality attached to the findings and official actions of

a board of equalization, if the members of such a board are subject to coercion or control of those who appoint them, taxpayers might be subjected to shocking injustices and unreasonable taxation. The idea that a board can be discharged at will and a new one appointed for the sole purpose of passing on the valuation of one taxpayer's property alone, is contrary to the principle of fairness and equality supporting the necessity for such agency.

7 Concerning the United States bonds defendant contends same were taxable because purchased on December 28, 1932, for the purpose of evading taxation; and as a circumstance tending to show such intention, claims that these bonds were sold and converted back into money January 28, 1933. It is not seriously contended that these bonds were not in fact actually purchased, or that the transaction by which they were acquired was merely simulated, so that in fact plaintiff never acquired any title to same. The evidence, as we construe it, is undisputed that they were in fact purchased, and plaintiff acquired absolute title thereto. Under such circumstances, we are strongly inclined to the view that they were non-taxable, regardless of what may have been the motive prompting the purchase of same. However, we find that it is not necessary to so hold in this instance. One of the members of the board of equalization testified that prior to August 28, 1933, he made an independent investigation concerning the acquisition of these bonds by plaintiff. He ascertained that a surplus of $100,000.00, which the company intended to distribute as dividends in January, was invested in United States bonds pending the distribution. This sum was disallowed by the board as a deduction. He further stated that, according to his opinion, the purchase of the remaining $302,071.87 of bonds was in good faith. His testimony indicated that he ascertained that the company had purchased tax-exempt securities at various times during the year 1932, and he was convinced that there was no intention to evade taxes by reason of the purchase of the bonds in question. It thus appears that the question of whether or not these bonds were properly deductible was passed upon by the board as an issuable fact, and was decided adversely to the contention of defendant. While this action may have been irregular, we think it was final.

8 However, the dominant question around which this controversy is urged, is the constitutionality of the Act of 1927, known as Article 5057a, which is as follows:

"That Fire Insurance Companies and Casualty Companies

incorporated under the laws of this State shall hereafter be required to render for State, County and Municipal taxation all of their real estate as other real estate is rendered. All personal property of such insurance companies shall be valued as other property is valued for assessment in this State in the following manner: From the total valuation of their assets shall be deducted *the reserve,* and from the remainder shall be deducted the assessed value of all real estate owned by such companies, and the remainder shall be the taxable personal property of such companies, to be assessed as other property."

Defendant contends that the allowance of a deduction of the reserve by fire insurance companies amounts to an exemption of property owned by such a company, and is therefore void under one or more provisions of the Constitution. Manifestly, if such deduction amounts to an exemption of taxable property, it is void, and citation of authorities is unnecessary.

We believe the statutes themselves furnish a guide to a true determination of the meaning of the "reserve" which may be deducted under this statute. Subdivision 7 of Article 4682, which article defines the duties of the Commissioner of Insurance, reads as follows:

"Shall calculate reserve on fire insurance.—For every company doing fire insurance business in this State, he shall calculate the *reinsurance reserve* for unexpired fire risks by taking fifty per cent. of the premiums received on all unexpired risks that have less than one year to run, and a pro rata of all premiums received on risks that have more than one year to run. When the *reinsurance reserve,* calculated as above, is less than forty per cent. of all the premiums received during the year, the reinsurance reserve in this case shall be the whole of the premiums received on all of its unexpired risks. For every company transacting any kind of insurance business in this State, for which no basis is prescribed by law, he shall calculate the reinsurance reserve upon the same basis prescribed in this article as to companies transacting fire insurance business."

Subdivision 9 of said Article, relating to impairment of capital, is as follows:

"When company's capital is impaired.—Having charged against a company other than life, the *reinsurance reserve,* as prescribed by the laws of this State, and adding thereto all other debts and claims against the company, he shall, in case he finds the capital stock of the company impaired to the extent of twenty per cent., give notice to the company to make good its whole capital stock within sixty days, and, if this is not done, he shall require the company to cease to do business within this

State, and shall thereupon, in case the company is organized under authority of the State, immediately institute legal proceedings to determine what further shall be done in the case."

Article 5036 relating to payments of dividends by fire insurance companies is as follows:

"No life, health, fire, marine or inland insurance company, organized under the laws of this State, shall make any dividend except from the surplus profits arising from its business. In estimating such profits, there shall be reserved therefrom a sum equal to forty per cent. of the amount received as premiums on unexpired fire risks and policies, and one hundred per cent. of the premiums received on unexpired life, health, marine or inland transportation risks and policies, which amount so reserved is hereby declared to be *unearned premiums*. There shall also be reserved the amount of all unpaid losses, whether adjusted or unadjusted; all sums due the company on bonds, mortgages, stocks and book accounts, of which no part of the principal or the interest thereon has been paid during the year preceding such estimate of profits, and upon which suit for foreclosures or collections has not been commenced, or which after judgment has been obtained thereon shall have remained more than two years unsatisfied, and upon which interest shall not have been paid. In case of any such judgment, the interest due or accrued thereon and remaining unpaid shall also be reserved. Any dividend made contrary to the provisions of this article shall subject the company making it to a forfeiture of its charter, and the Commissioner shall forthwith revoke its certificate of authority."

Article 4927 requires fire insurance companies to submit an annual statement of the condition of such companies on the last day of the month of December preceding. It was in pursuance of this statute that plaintiff filed the statement heretofore mentioned. Article 4928 prescribes what such statement shall contain, and subdivisions 6 and 7 of this Article are as follows:

"The *liabilities* of such company, specifying the losses adjusted and due; losses adjusted and not due; losses unadjusted; losses in suspense and the cause thereof; losses resisted and in litigation; dividends, either in scrip or cash, specifying the amount of each declared but not due; dividends declared and due; *the amount required to reinsure all outstanding risks on the basis of forty per cent. of the premium on all unexpired fire risks* and one hundred per cent. of the premium on all unexpired marine and inland transportation risks; the amount due banks or other creditors, naming such banks or other creditors and the amount due to each; the amount of money borrowed by the

company, of whom borrowed, the rate of interest thereon and how secured; all other claims against the company, describing the same."

"The income of the company during the preceding year, stating the amount received for premiums, specifying separately fire, marine and inland transportation premiums, *deducting reinsurance;* the amount received for interest, and from all other sources."

A careful comparison and examination of these various articles leads us to the conclusion that the "reserve" mentioned in Article 5057a which may be deducted from the value of assets of a fire insurance company is what is designated in subdivision 7 of Article 4682 as "reinsurance reserve," and is designated in Article 5036 as "unearned premiums." According to the interpretation of the Commissioner of Insurance it is more properly designated "unearned premium reserve." It seems to have a well-known and well-defined general meaning in the insurance business, and the meaning is somewhat different as between life insurance companies and fire insurance companies. There is also in the fire insurance and casualty insurance business a distinct difference between the unearned premium reserve or reinsurance reserve, and the reserve for unpaid losses, or the "loss claims reserve." Maryland Casualty Company v. United States, 251 U. S. 342, 40 Sup. Ct. 155, 64 L. Ed. 297; United States v. Boston Insurance Company, 269 U. S. 197, 46 Sup. Ct. 97, 70 L. Ed. 232; McCoach v. Insurance Company of North America, 244 U. S. 585, 37 Sup. Ct. 709, 61 L. Ed. 1333.

A very accurate general definition of reinsurance reserve is found in the Annotation in 13 A. L. R. page 187, being taken in substance from the opinion in the case of Trenton v. Standard Fire Insurance Company, 77 N. J. Law 757, 73 Atl. 606, and is as follows:

"The reinsurance reserve in fire insurance is a fund composed of the portions of gross premiums of policies in force, which have not been earned by the insuring company, and its chief purpose is to enable the company to rid itself of liability for future possible claims when continued excessive losses threaten to use up its surplus and impair its capital to such an extent as may endanger the security of the policyholders, either by paying back the unearned premiums and cancelling the policies, or by paying them over to a new insurer to assume and carry out the policy risks."

We think our statutes very clearly define the reinsurance reserve, as concerns fire insurance companies, as the amount required to reinsure all outstanding risks on the basis of forty

per cent. of the premiums on all unexpired fire risks; or in other words, a sum equal to forty per cent. of the amount received as premiums on unexpired fire risks and policies. The method by which this sum is arrived at is specifically set out in subdivision 7 of Article 4682, and the amount is found by "taking fifty per cent. of the premiums received on all unexpired risks that have less than one year to run, and a pro rata of all premiums received on risks that have more than one year to run." In view of the fact that the reserve must be calculated upon the basis of all unexpired policies, the Legislature no doubt determined that fifty per cent. of all premiums on unexpired risks that have less than one year to run, and a pro rata of all premiums on unexpired risks that have more than one year to run, would produce in the aggregate an amount sufficient to reinsure all outstanding risks on a basis of forty per cent. of premiums on unexpired risks.

We think, therefore, that the reserve mentioned in Article 5057a was unquestionably the *reinsurance reserve*.

In its rendition, plaintiff made deductions as follows:

Reserve for unearned premiums $1,542,532.05.

Reserve for unpaid losses $125,026.56.

Reserve for taxes $115,120.00.

Reserve for reinsurance balances $51,594.37.

**9** From what we have said it follows that under the statute in question, only the reserve for unearned premiums in the sum of $1,542,532.05 was deductible. As we understand, this is the sum which was allowed by the Insurance Commissioner in the annual statement filed as of date December 31, 1932, and was arrived at by taking fifty per cent. of the premiums received on all unexpired risks that had less than one year to run, and a pro rata of all premiums received on risks that had more than one year to run, after deducting the amount which had been paid by the defendant company for reinsurance. It is presumed that the amount paid for reinsurance will be accounted for as premiums received by other insurance companies. Regardless of a right to deduct the other items mentioned, to-wit, reserve for unpaid losses, reserve for taxes, and reserve for reinsurance balances, in the absence of Article 5057a, we are of the opinion that said article was intended to be exclusive, and only the unearned premium reserve or reinsurance reserve, was deductible. The Legislature may have very wisely decided that the deduction of the reinsurance reserve was sufficiently generous, and was unwilling to allow deduction of other reserves, such as are above mentioned. We do not think taxes are deductible as a debt under Article 7147, R. S. 1925. See authorities above

cited, and the case of Tax Commission v. National Malleable Castings Company, 111 Ohio St. 117, 144 N. E. 604, 35 A. L. R. 1448, and Annotation.

**10** This brings us to a discussion of the constitutionality of Article 5057a. The question of whether or not the reserve of fire insurance companies may be deducted from the valuation of personal property, in the absence of an express statute allowing such deduction, has been many times before the courts of our country. In practically all cases, until quite recently, the question has arisen in cases where the fire insurance company sought to deduct such reserve from credits under a general statute, such as is Article 7147 of our statutes, which authorized a deduction of "debts" or "indebtedness" from credits. By the great weight of decisions it has been held that fire insurance reserves were not such indebtedness as was deductible from the value of credits. This result was reached by application of a strict rule of construction to the words "debts" and "indebtedness," it being held that although fire insurance reserves were liabilities of the company, they were of such contingent character that they could not properly be held to be debts or indebtedness within the purview of these general statutes. See Annotation, 13 A. L. R. 186 to 204, and Annotation in 78 A. L. R. 562 to 566. In cases of life insurance reserves it has generally been held that they were deductible, even in the absence of a special statute to that effect. See same Annotations.

It must be carefully noted, however, that we have a different question here. Article 5057a expressly permits a deduction of the reserve. The question, therefore, for decision is the constitutionality of that Act. The cases cited by defendant do not hold that such a statute is unconstitutional. They draw a distinction between life insurance reserves and fire insurance reserves, and hold that the latter are not deductible under a general statute authorizing deduction of indebtedness. The case of Standard Life Insurance Company v. City of Atlanta, 151 Ga. 153, 106 S. E. 110, might have been cited as apparently holding an act allowing a deduction of a reserve unconstitutional. In a few States statutes such as are here involved have been enacted, and deductions of reserves of fire insurance companies allowed without the question of constitutionality of the statute being involved. In Missouri, a statute which allows a deduction or allowance in the valuing of personal property of a fire insurance company of "the legally required reserve necessary to reinsure its outstanding risks and unpaid policy claims" was held constitutional in a very able opinion by the Supreme Court. State v.

Gehner, 320 Mo. 691, 8 S. W. (2d) 1068. In the case of Hardware Mutual Fire Insurance Co. v. Stinson, 210 N. C. 69, 185 S. E. 449, the Supreme Court of North Carolina held an act permitting fire insurance companies to deduct unearned premiums from the value of personal property constitutional. In our opinion, the reasoning in these cases is sound. In the last mentioned case, the court referred to the surrender and cancellation provisions of the policy, which were similar to such provisions in all standard policies, and after setting out the provisions of the statute with reference to the deduction of the insurance reserve in estimating the value of personal property, used the following language:

"From a reasonable construction of the above statutes, we think the unearned premiums a liability of the company. This statute in no way impinges on the Constitution. Unearned premiums, ipso facto, to some extent denote a liability. 'Unearned premium—That portion which must be returned to insured on cancellation of policy. Aetna Ins. Co. v. Hyde, 315 Mo. 113, 285 S. W. 65, 71.' Black's Law Dictionary (3d Ed.) p. 1404.

"The cases cited by the litigants are in woeful conflict and we see no necessity to discuss them; but where statutes are in existence in the different States on the subject, as in this State, by the weight of authority the courts seem generally to hold that unearned premiums are a liability and can be deducted from solvent credits. We see no reason why the statutes in this State should be nullified. Plaintiff, within its legal rights recognized by statutory enactment, deducted its unearned premium as a liability from its solvent credits. The taxing authorities recognized this method, until the tax investigator decided otherwise, hence this controversy.

"It goes without saying that no tax should be imposed which is not just, on either corporation or individual. The ideal of government is equal justice, under law. *Later when the premiums are earned or returned they will be taxed, and no escape from tax can take place by deducting unearned premiums from solvent credits.*" (Emphasis ours.)

In the case of State v. Gehner, supra, the court first entered into a discussion of the constitutionality of acts permitting the deduction of indebtedness in ascertaining the value of taxable credits, and showed by numerous authorities that such statutes are constitutional. The holding is based upon the equitable rule that the just taxable value of credits is to be ascertained by deducting the indebtedness of the owner. The court then proceeds to say: "If, as the authorities cited hold, the just value of credits is to be ascertained by deducting from their gross

amount the bona fide indebtedness of the owner, then a statute which authorizes that method of assessing credits for taxation can not be violative of any of the provisions of the Constitution." The court then carefully notes the distinction between the reserve of a life insurance company and the reserve of a fire insurance company, which distinction is strongly relied upon by the defendant in this case. It is held that the reserve of a life insurance company is clearly deductible. The court then proceeds to discuss the question of the allowance of a deduction of the reserve of a fire insurance company and says:

"In considering the nature of the legal reserve of an insurance company other than life, it must be kept in mind that the construction of a statute permitting the deduction of *debts* from credits is not involved in this case. It may be conceded that the requirement for the maintenance of such a reserve is not a debt in a technical sense. Yet it is a *liability* (State v. Schramm, 271 Mo. 223, 196 S. W. 21); such liability, considered with reference to a particular policy, may be regarded as contingent, *but with reference to the outstanding insurance of the company as a whole it is definite and fixed, made so by statute.* Section 6222, R. S. 1919. This statutory liability is determined annually as to each company by the State Superintendent of Insurance *and made the test of solvency.* Sections 6222 and 6225, R. S. 1919. The assets of such a company as a whole are impressed with this *liability,* and only assets in excess of it can be distributed in the form of dividends, earnings or profits. Section 6333, R. S. 1919. We are therefore of the opinion that it can not reasonably be said that the value of the credits of such an insurance company after the deduction of the reserve is not their just and true value." (Emphasis ours.)

In view of the provisions of our statute hereinbefore set out, this language is peculiarly pertinent. We are of the opinion that the Legislature has since 1875 affirmatively recognized that unearned premiums are not to be regarded as assets of a fire insurance company. Article 5036 contains, in substance, the provisions of a similar statute enacted in 1875. This article prohibits the making of dividends by a fire insurance company except from profits of the company. It is then provided that in estimating such profits there shall be reserved therefrom a sum equal to forty per cent of the amount received as premiums on unexpired fire risks and policies, which amount so reserved is declared to be *"unearned premiums."* We think this a legislative declaration that these unearned premiums are not to be regarded as property of the company, but are to be regarded as belonging to policyholders for the future protection, stability

and satisfaction of their policies. It is true that in due course of business these premiums may be earned, but as earned they will be to some extent at least paid to policyholders in accordance with their contract. There is a probability that in case of insolvency they may be entirely appropriated to satisfaction of surrender values or reinsurance. But in all events, as indicated in the quotation from the Supreme Court of North Carolina, when the premiums are earned or returned they may be taxed, and no escape from taxation can take place by deducting these unearned premiums from solvent credits.

We are required to uphold the constitutionality of this Act of the Legislature, unless it should clearly appear that it is condemned by the Constitution. The question is not one primarily of exemption of property from taxation, but is the fixing of a standard of valuation of personal property for taxation. In light of the fact that these reserves are required by law for the protection of policyholders, and in reality constitute the very basis upon which the stability and solvency of insurance companies depend, and in view of the further fact that they unquestionably represent a fund held in trust for the protection of policyholders, which fund, potentially at least, may be completely appropriated to payment of liabilities, certainly justify the Legislature in classifying them as deductible indebtedness. The question is not one of lack of power, but purely of the exercise of discretion and judgment on the part of the Legislature.

In our opinion, then, the deduction of the reserve for unpaid losses, the reserve for taxes, and the reserve for reinsurance balances, amounting in the aggregate to $291,740.93, was not allowable under Article 5057a. The action of the plaintiff in deducting these items from its rendition constituted a failure to render same for taxation. The board therefore did not properly have before it the question of valuing these items. For this reason, we do not think the valuation fixed by the board can be regarded as including the value of these items. As plaintiff is not complaining of the action of the board in fixing the valuation of the rendered property at $215,000.00, we are of the opinion that its action in that regard is final. In view of what we have said, the amount of taxes tendered by plaintiff is all that could be collected under the circumstances. The trial court was therefore correct in granting the injunction restraining the attempted revaluation and reassessment, and was correct in issuing a mandamus to require acceptance of the amount of taxes tendered.

The judgment of the Court of Civil Appeals is hereby reversed and the judgment of the district court is affirmed.

Opinion adopted by the Supreme Court January 20, 1937.

## ON MOTION FOR REHEARING.

In view of an apparent misconstruction of certain language in our original opinion, we make the following additional comment.

11  Counsel apparently draw the conclusion that we intended to hold that after a fire insurance company has deducted from the total value of all of its personal assets "the reserve," the balance remaining is to be taken as the taxable value, and is to be adopted by the taxing authorities as the value at which the personal assets are to be assessed. We clearly intended to hold, and do hold, that after the amount of taxable personal assets is ascertained as provided by Article 5057a, the taxing authorities shall proceed to value same for taxation exactly as property of other taxpayers is valued. This is the holding in the case of City of Galveston v. American National Insurance Company, 14 S. W. (2d) 897, following the decision in the case of City of Waco v. Amicable Life Insurance Company, (Com. App.) 248 S. W. 332. We think our opinion is in no manner inconsistent with the opinion in the latter case.

12  It is strongly urged by defendants in error that our opinion on certain questions is in conflict with findings of fact made by the Court of Civil Appeals. In this case the trial court withdrew the case from the jury, and we did not interpret the opinion of the Court of Civil Appeals as attempting to make findings of fact binding upon this Court. It merely drew conclusions from the undisputed evidence, and this Court could do likewise. In our opinion we sought to be guided solely by facts which we considered as undisputed.

The motion by plaintiff in error to reform and correct the opinion is overruled, and motion for rehearing by defendants in error is likewise overruled.

Opinion adopted by the Supreme Court March 3, 1937.