GLENN H. McCARTHY, Inc., et al. v. SOUTHERN UNDERWRITERS.

No. 9531.

Court of Civil Appeals of Texas. Austin.

Jan. 23, 1946.

Rehearing Denied Feb. 20, 1946.

Fulbright, Crooker, Freeman & Bates (by W. N. Arnold, Jr.), of Houston, Thompson, Knight, Harris, Wright & Weisberg (by Pinckney Grissom), of Dallas, Davis, Hall, Clemens & Knight (by J. C. Hall), of San Antonio, and J. H. Burr, of Houston, for appellants.

J. Hubert Lee, of Austin, amicus curiae on motion for rehearing.

Critz, Kuykendall, Bauknight, Mann & Stevenson (by Richard Critz) and Renne Allred, Jr., all of Austin, for appellee.

BAUGH, Justice.

In a suit by the State of Texas against The Southern Underwriters, a reciprocal or inter-insurance exchange, operating under the provisions of Chap. 20, Title 78, Arts. 5024–5033a, Vernon's Ann.Civ.St., the trial court found said exchange to be hopelessly insolvent and on February 19, 1942, appointed Will G. Knox as receiver thereof. Knox qualified as such on February 24, 1942. In June 1945 said receiver, on behalf of the creditors of Southern Underwriters, filed a motion in said receivership proceeding, seeking to have the court determine: (1) The extent of the insolvency of said exchange as of December 31, 1936, December 31, 1937, and July 20, 1938; (2) The amount of unpaid claims against it at such times; (3) that the subscribers had not, during such periods, kept intact as surplus to pay such claims the "advance deposits" required of them by their contracts; and (4) prayed that the court authorize and direct the receiver to collect, by suit, if necessary, from such subscribers or policyholders, the respective amounts due by each of such subscribers on such advance deposits. After due notice and hearing on such motion, wherein numerous parties who were subscribers to said exchange during the periods of time involved appeared and contested such motion, the trial court granted to the receiver the relief and authority sought, decreeing in said judgment, among other things, as follows:

"7. That each subscriber at The Southern Underwriters agreed and contracted, during the period from December 31, 1936, to July 20, 1938, inclusive, to keep his advance deposits, as shown in his respective policy contracts, intact as a surplus for the payment of such subscribers' proportion of losses and expenses of the Exchange.

"8. That the subscribers at The Southern Underwriters did not, on December 31, 1936, December 31, 1937, and July 20, 1938, or at any time during said periods, keep their advance deposits, as shown in their respective policy contracts, intact as a surplus for the payment of their losses and expenses.

"9. That The Southern Underwriters has no assets except $6,792.42 in cash and a cause or causes of action against the subscribers at The Southern Underwriters to require them to place intact their said advance deposits.

"10. That all of the advance deposits on policies issued to the subscribers at The Southern Underwriters in force on December 31, 1936, December 31, 1937, July 20, 1938, and at all times during said periods, aggregates $249,161.96.

"11. That there will not be collected from said advance deposits more than the sum required to pay the claims of the creditors of The Southern Underwriters and the necessary expense of the receivership.

"12. That it is necessary in order to pay the claims for losses and expenses against The Southern Underwriters that the subscribers at The Southern Underwriters place intact their said advance deposits as shown in their respective policy contracts in force at, on, and after December 31, 1936."

From these findings and conclusions this appeal is prosecuted. The sole question presented is whether the subscribers or policy holders are liable, to the extent of their advance deposits, which they had not maintained intact, for their pro rata share of the losses sustained by the exchange. It is the contention of appellants that such advance deposits were intended only as security for the payment of earned premiums or deposits as determined at the end of the contract period. That is, that at the end of contract or policy period, the earned deposit was to be then determined, and the unearned advance deposit then returned to the subscriber.

It is necessary, therefore, to look to the nature of the business involved, the provisions of the subscribers' application or

agreement, the terms of the policy issued, and the beneficiaries of the insurance carried. The policies here involved were Workmen's Compensation policies, and the losses sustained were claims of injured employees, who were the real beneficiaries, whose claims have not been paid, and for whose benefit this suit was brought.

■ This method of insurance is denominated by the statute (Art. 5024, R.C. S.) as reciprocal or inter-insurance; and is conducted by the subscribers through a designated attorney in fact. The exchange has no stock, declares no dividends, and does not operate for profit, nor have a fixed premium for which the policy is issued. The subscribers are both insurers and insured and the rights and liabilities of such subscribers are fixed and determined by their applications, the policies issued and the governing laws, all of which enter into and become parts of their contracts. Sergeant v. Goldsmith Dry Goods Co., 110 Tex. 482, 221 S.W. 259, 10 A.L.R. 742; Griffith v. Associated Employers' Reciprocal, Tex. Civ.App., 10 S.W.2d 129; Hill v. Blanco National Bank, Tex.Civ.App., 179 S.W.2d 999. The amount initially deposited by the subscriber at the inception of his contract is not a premium, as used in policies generally, fixed by the Board of Insurance Commissioners as the consideration for the protection afforded by the policy. Alyea-Nichols Co. v. United States, D.C., 12 F.2d 998. The application and agreement made by the subscriber and the policy issued thereon (both of which are interrelated and constitute the insurance contract) mutually bind all subscribers to share proportionately the loss or losses sustained by any of them. The "application and agreement" contained, among other things, the following provisions:

"7. Our Attorney-in-fact is authorized to accumulate a surplus from the monies received as a result of this agreement of not to exceed one-third of our average gross annual premium on all insurance contracts in force at The Southern Underwriters, which surplus shall be retained by the Attorney-in-fact as our part of the protection for all Subscribers at The Southern Underwriters."

"8. Our Attorney-in-fact is authorized to issue contracts whenever and however applied for by us, which contracts and renewals thereof we hereby agree to accept, and to make the payments required as a result thereof. We agree to keep our ad-vance deposits intact as a surplus for the payment of our proportion of losses and expenses and to pay promptly all demands for monies to be used for the purposes set forth in this agreement. Failure to pay promptly such demands shall be cause for legal enforcement of same at our expense, and our Attorney-in-fact is specifically authorized to bring such proceedings in the name of The Southern Underwriters, or in its own name as Attorney-in-fact for Subscribers at The Southern Underwriters."

■ Such application also contained information as to the character of business of the applicant, number of employees, amount of payroll, how paid, etc. In brief, data upon which the possible cost of the insurance to the subscriber might be computed or estimated in advance. We think it is clear from the foregoing agreement, if taken alone, that it was the purpose of the exchange and of the subscribers, through their deposits, to provide a sufficient fund to not only meet estimated costs of such insurance; but also, through keeping "our advance deposits intact" to thereby provide, in addition to the contemplated needs, a surplus to pay any losses or expenses that might be incurred within the terms of the contract. Such surplus, therefore, is in addition to the actual insurance costs contemplated, and is designed to cover unanticipated losses. If appellants' construction of the contract be correct, then no such surplus could ever be available. In support of it they rely upon certain provisions of the policy relating to what the policy designates as "premiums". However, the policy itself provides that wherever the term "premium" is used "it is a term of convenience used to designate the deposit made by the subscriber for the purpose of exchanging indemnity as herein contemplated, which in no sense is to be construed as a stipulated payment to other subscribers for this contract." Said policy further provided that at the end of the contract period the subscriber must report to the exchange the "remuneration earned by the employees during such period," which is but another way of saying the amount of claims paid or due to injured employees; and "If the earned deposit or deposits thus computed are greater than the initial deposit or deposits, this subscriber shall immediately deposit the initial amount with the Carrier; if less, the Carrier shall return to the subscriber the unearned portion, * * *." The policy further provided as a "Basis of

472

Premiums," among other things, that "If at the end of the contract period, such entire remuneration exceeds the estimate set forth in said schedule, the Subscriber shall immediately pay to the Exchange the additional premiums earned; if such remuneration is less than said estimate, the Exchange shall return the unearned premiums when ascertained * * *."

If, as appellants contend, these provisions of the policy limit the liability of the subscriber at the end of each year to the so-called earned "premium" and entitle him to a return of all deposits above that amount, the provision in his "application and agreement" that he is to keep an advance deposit "intact" to provide a surplus is in effect nullified and the employees, who are the real beneficiaries, are denied the protection contemplated. Such provisions may be reasonably construed as relating only to the actual costs of such insurance, and not to the advance deposits designed to create a surplus from which to pay losses. If the subscriber be entitled to a return, upon such conditions, of his advance deposits, certainly they are not kept "intact" as he contracted that they should be. And if such apparent contradictions or discrepancies between the application and the policy, both of which instruments constitute the insurance contract, thus create an ambiguity, the policy should be liberally construed against the insurer and in favor of the real beneficiaries who are the employees. 24 Tex.Jur. § 29, p. 705, and numerous supporting authorities.

But if the construction of the contract urged by appellants be applicable, we are unable to see how it can profit them in the instant case. The trial court found that at all times here in question the exchange was insolvent. That is, in effect, that such advance deposits were not at any time sufficient to pay the losses sustained. That being true there could not have been, under appellants' interpretation of the policies, any unearned premium or unearned deposit to be returned to the subscriber; and under the express terms of Section 8 of his application and agreement above set out he clearly obligated himself to keep intact the very funds needed as protection against the contingency which in fact had occurred. His failure to do so rendered him liable under his own agreement and authorized the exchange to bring suit "for legal enforcement of same." We think, therefore, that the receiver was clearly authorized and required to collect pro rata from each of the subscribers who had not lived up to their agreements to keep intact the contingent fund therein provided to pay such losses; and that the trial court properly so held. The judgment is accordingly affirmed.

Affirmed.