## ARCHIE et al. v. KNOX.
### No. 9815.

Court of Civil Appeals of Texas. Austin.

Oct. 26, 1949.

Rehearing Denied Nov. 16, 1949.

Looney, Clark & Moorhead, by R. Dean Moorhead, of Austin, for Longview News Co., Inc., et al.

Glenn Perry, of Houston, for J. H. Rose.

Smith, Rotsch & Steakley, by Cecil C. Rotsch, of Austin, for F. A. Hill and S. I. Hill, individually and d/b/a Hill Truck Line.

Renne Allred, Jr., of Austin, Devereaux Henderson, Houston, for appellee.

HUGHES, Justice.

Appellee, Will G. Knox, as statutory receiver for Allied Underwriters, a reciprocal insurance exchange organized under the provisions of Chap. 20, Title 78, Arts. 5024 et seq., Vernon's Ann.Civ.St., sued 42 named defendants and approximately 1482 unnamed defendants as subscribers to such exchange, for the purpose of obtaining levy of an assessment against such defendants as provided in Art. 5026, Sub. 4, V.A.C.S.

Trial before a jury resulted in withdrawal of the case from its consideration and rendition of judgment for appellee by the court. Certain of the named defendants have appealed.

Appellants have limited their appeal to questions concerning the alleged insolvency of Allied Underwriters and the period or periods of such insolvency.

The record is very large and contains a mass of technical evidence and exhibits which will be adverted to only in so far as necessary to dispose of the precise points made by appellants in their brief. We gratefully acknowledge efforts of counsel to eliminate our perusal of much of the statement of facts.

■ Appellants' first point is that the trial court erred in holding as a matter of law that Allied Underwriters was insolvent from December 31, 1940, to August 17, 1943, because a report of an examination conducted by the Board of Insurance Commissioners was, of itself, sufficient to raise a fact issue as to insolvency between December 31, 1940, and September 30, 1941.

This report recited that as of December 31, 1940, the Allied Underwriters had a surplus of $42,013.85, and that as of September 30, 1941, its surplus was $24,796.17.

In our opinion these recitations, even though accepted at face value, reflect insolvency rather than solvency.

Article 5029, V.A.C.S. requires reciprocal insurance exchanges such as Allied to maintain a surplus over all liabilities, including reserves, of not less than $50,000. This statutory requirement prescribes a standard of solvency or insolvency for these exchanges. Art. 5030, V.A.C.S.; Howell v. Knox, Tex.Civ.App., Austin, 211 S.W.2d 324, par. 7 (Writ Ref. N.R.E.).

Appellant, however, contends that it was exempt from this surplus requirement under the following provision of Art. 5029, supra:

" * * * Any exchange whose attorney in fact now has a certificate of authority to transact business in this State shall have until December 31, 1941, to fulfill the foregoing financial requirements specified in this Article * * *."

We find no exemption contained in this language. Only a period of grace is granted. In our opinion an exchange not having the required surplus on the effective date of Art. 5029, supra, was, by virtue of the statute, insolvent, but the consequences of such insolvency were abated until December 31, 1941, during which interval the exchange could obtain the required surplus or, for good cause, procure an extension of time as permitted by another section of the statute.

■ Appellants' second point is to the effect that the trial court erred in finding insolvency, as a matter of law, at any time between December 30, 1940, and June 30, 1943, because no evidence was offered to show what the Loss Payable Reserve of Allied Underwriters should have been under the Rules and Regulations of the Board of Insurance Commissioner.

Appellants concede that as shown by the balance sheets prepared by Mr. Herring, who was appellee's witness, and report of an examination report conducted by the Board, the actual insolvency of Allied Underwriters during the period December 30, 1940, to June 30, 1943, is shown, provided that the balance sheets of Mr. Herring were prepared in accordance with the Rules and Regulations of the Board of Insurance Commissioners. Appellants deny that they were so prepared.

Narrowed down, and as stated by appellants, "the question of whether the reciprocal (Allied Underwriters) was solvent, as shown by its records—or was insolvent—as shown by Mr. Herring's balance—can be answered only by determining whether the reciprocal's Loss Payable Reserve was proper or whether such Reserve should have been in the amount determined by Mr. Herring"; the "Per Case Basis" being used by Mr. Herring.

The controversy revolves around the intricacies of bookkeeping and accounting and particularly whether the reserves should have been calculated upon the "Per Case Basis" or by the "Schedule P Method."

In computing the reserves on the "Per Case Basis" each case or claim against the company is examined to determine the actual liability thereon and a reserve is established on the basis of the total liability disclosed.

The "Schedule P Method" of computing reserves is to base the reserve for the current year on the loss experience of the company in past years.

Mr. Herring testified that during the year 1942 and during all other years pertinent to this lawsuit, the Board of Insurance Commissioners instructed and required Allied Underwriters and other companies of its kind to compute their Loss Payable Reserves according to the "Schedule P" formula.

The legal basis for appellants' contention that balance sheets of Mr. Herring were improperly prepared and hence insufficient is the following provision of Art. 5029, supra:

"There shall be maintained at all times such reserves as are required, or which, by the laws of this State or by the lawful rules and regulations of the Board of Insurance Commissioners, hereafter may be required, to be maintained by stock insurance companies transacting the same kind or kinds of insurance business."

It seems to us that the "Schedule P Method" and the "Per Case Basis" of calculating Loss Payable Reserves each has its proper function. Manifestly, it would be impossible for a reserve to be created from income for the current year according to the "Per Case Basis" because the extent of liability would then be unascertainable. Resort then must be made to the loss experience of previous years.

Quite to the contrary is the situation here where, years after the exchange has ceased business, the exact losses are known, and the issue before the court is one of solvency or insolvency during certain periods of time.

We find nothing in the statute (5029) and nothing in the "Schedule P" requirement of the Board which suggests that the fiction disclosed by "Schedule P" must be accepted by a court as true in face of the facts disclosed by the "Per Case Basis," in a case of this character. A contrary construction of the "Schedule P" Rule would make it so arbitrary and unreasonable as to render it unenforceable.

■ Appellants' last point is that there was evidence other than that set out above which created a jury question as to the insolvency of Allied Underwriters from December 31, 1940, to June 30, 1943.

The general ledger of Allied Underwriters was offered in evidence by appellee and an account marked "Surplus" shows a balance of $269,261.06 as of December 31, 1940; a $276,002.20 balance as of December 31, 1941; a balance of $173,420.23 as of December 31, 1942; and a balance of $146,920.23 as of February 28, 1943.

We are not informed by appellants the manner in which these surpluses were determined. It is conceded by them, however, that they did not take into account a Reserve for Losses Payable. Further concession is made by appellants that if a Loss Payable Reserve is calculated for the various periods involved on the "Per Case Basis" there would be no surplus during any of such periods except as of December 31, 1940, when a surplus would be shown of less than $50,000.

Even if full faith be given to these ledger surpluses it is apparent that they do not show solvency. As indicated above, the "Per Case Basis" of Calculating Loss Payable Reserves is certainly proper after

the facts are known and there is no need to resort to prior experience. The indicated surplus of less than $50,000 on December 31, 1940, did not show solvency under Art. 5029, supra.

We are further of the opinion that these "ledger surpluses" are too discredited by the financial management of Allied Underwriters to be competent evidence and we will later in this opinion refer to the facts upon which this conclusion is based.

It is next claimed by appellants that certificates of authority issued by the Board of Insurance Commissioners to Allied Underwriters from 1940 to 1943 are evidence of its solvency.

These certificates are based upon sworn statements of the insurance company seeking the certificate. The sworn statements are hearsay and so is the certificate in so far as it is offered to prove any fact contained in the sworn statements. At most the certificates only raise a presumption of solvency which is not evidence. Southland Life Ins. Co. v. Greenwade, 138 Tex. 450, 159 S.W.2d 854 (Comm. of Appeals).

Financial reports filed by Allied Underwriters with the Board of Insurance Commissioners showed surpluses of $64,437.45; $44,269.91; and $61,729.95 for the years 1940, 1941 and 1942, respectively.

Appellants would have us hold that these hearsay and self-serving statements raise an issue of solvency. Similar reports were held inadmissible in evidence in Howell v. Knox, supra. Furthermore, these reports affirmatively show that the Loss Payable Reserve was calculated according to "Schedule P Method" and the undisputed evidence shows that such method was highly inaccurate in the light of losses actually sustained.

In the same category as the financial reports, above discussed, are the annual statements of Allied Underwriters.

It is shown without dispute that the Allied Underwriters manipulated its accounts and books to show solvency just before the first of each year when the annual report was due and just before examination by the Board, about the 1st of October. The method of padding assets was to take old accounts, which were inadmissible by the Board as assets, furniture and fixtures and sell them to the Allied Underwriters Corporation and then buy them back for about the same price as they were sold. Specifically the record shows these transactions:

Allied sold old accounts to the corporation on December 3, 1940, for which it received $25,356.32. These accounts were reacquired by Allied on January 6, 1941, for which it paid the corporation the sum of $25,642.74.

On March 3, 1941, Allied sold the corporation accounts for $15,740.37, and on September 30, 1941, accounts for the sum of $22,048.05. On January 12, 1942, Allied paid the corporation $45,000 for these and possibly other accounts.

A similar transaction occurred on December 30, 1942, in the sum of $60,000. Allied repaid this amount on January 30, 1943.

The record also shows that during the years 1940-43, inclusive, there was advanced and contributed to Allied by its attorneys in fact the sum of $137,500, and that of this amount and during the same period there was withdrawn by the attorneys in fact the sum of $113,500.

Under Art. 5029a these advances could only be withdrawn with approval of the Board and on the conditions set out in the statute. Compliance with these conditions and approval of the Board is not shown.

These matters relating to the methods employed by Allied to bolster its financial condition and pad its books are recited for the purpose of supplementing the reasons already stated for our holding that the books and reports of Allied are insufficient to raise an issue of solvency during the periods involved.

Without explanation on the part of Allied, of which this record is devoid, the undisputed evidence of its financial transactions is such as to conclusively show that the surplus figures contained in the ledger and reports were not accurately nor fairly reached and hence they are so unreliable as to be without weight as evidence.

 We wish it understood that appellants are only unfortunate subscribers to Allied Underwriters and were in no way connected with the management of the exchange. Their liability for assessment is statutory and our duty is to enforce it and leave to others the question of its wisdom.

The judgment of the trial court is affirmed.