**PACIFIC FINANCE CORP. v. KNOX.**

No. 10007.

Court of Civil Appeals of Texas. Austin.

Jan. 23, 1952.

Rehearing Denied Feb. 20, 1952.

Second Motion Denied March 12, 1952.

Irion, Cain, Bergman & Hickerson, M. R. Irion, Frank Cain, Douglas E. Bergman, Richard H. Cocke, Jr., Dallas, Hugh M. Foster, Jr., Los Angeles, Cal., of counsel, for appellant.

Renne Allred, Jr., Austin, for appellee.

HUGHES, Justice.

Will G. Knox, receiver for Texas General Underwriters, a reciprocal insurance exchange organized under Articles 19.01–19.12, inclusive, Texas Insurance Code of 1951, V.A.T.S., filed this class suit against numerous named parties, including the appellant, Pacific Finance Corporation, as representatives of all other subscribers and policyholders at Texas General Underwriters during its period of insolvency for an order and judgment requiring each such subscriber and policyholder to place intact its advance premium deposit and for an assessment of one additional annual premium or premium deposit, or such portion thereof as might be necessary, in order to pay all claims and expenses of such exchange which arose during the period of insolvency.

A jury was used and certain issues, not related to the issue of insolvency, were submitted to it.

Upon this verdict and upon numerous fact findings made in the judgment the trial court rendered judgment establishing the liability of the subscribers or policyholders at Texas General Underwriters during the period January 31, 1946, to January 27, 1947, inclusive, for an assessment for an amount equal to one additional annual premium on each policy prorated during such period of time, decreeing a necessity for and levying such assessment and providing for interest thereon at the rate of six percent per annum from the date of the judgment until paid.

The judgment was without prejudice to the right of the receiver to require policyholders and subscribers who had withdrawn part of their advance premium deposit to place their premium account intact.

Provision was also made for the pro rata refund of unused assessment funds.

The Pacific Finance Company is the only appellant.

Appellant's first five points challenge the determination by the trial court that Texas General Underwriters became insolvent on January 31, 1946 and remained insolvent through January 27, 1947. The basis of this challenge is that the reserve held by Underwriters for unearned premium deposits was considered a liability when it should, according to appellant, have been treated as an asset. Appellee concedes that unless this reserve is treated as a liability then Underwriters was not insolvent at any time material to this case. We quote from his brief: "In fact, out of a trial lasting eleven days, producing thousands

of pages of testimony and exhibits, there emerges as the major issue on appeal, the succinct and rather simple question, to-wit: As to whether the obligation of an insurance company to refund unearned premiums is a liability or not. Appellant contends and asks reversal upon the proposition that that obligation is not a liability. Appellee contends that it is a liability. Appellant concedes in effect that if the obligation to return unearned premiums is a legal liability of the Exchange, that then Texas General Underwriters was insolvent at all material times. And Appellee, (without conceding that proof of insolvency of the Exchange is a necessary condition precedent to the right of the Court to fix an assessment by the judgment below, but still reserving that contention which we set up in our Seventeenth Counter-Point and Brief on Pages 85 to 90 of this Brief), would, nevertheless, likewise concede that if the obligation to refund unearned premiums is not a legal liability of the Exchange, that then the Exchange was not insolvent at any time material to this case."

Appellant concedes that Underwriters was insolvent on January 27, 1947.

The evidence shows that as of January 31, 1946, Underwriters' liabilities exceeded its assets by $611.28 if the reserve for unearned premium deposits amounting to $87,308.18 be considered a liability; but if not so considered the assets would exceed the liabilities by $86,695.90.

Appellant's position that these reserves are assets is based upon the following provision of the agreement executed by subscribers or policyholders at Underwriters: "Our Attorney-in-Fact is authorized to issue Contracts whenever and however applied for by us, which Contracts and Renewals thereof we hereby agree to accept, and to make the payments required as a result thereof. We agree to keep our Advance Deposit intact as a Surplus for the payment of our proportion of losses and expenses, and to pay promptly all demands for monies to be used for the purposes set forth in this Agreement. Failure to pay promptly such demands shall be cause for legal enforcement of same at our expense, and our Attorney-in-Fact is specifically authorized to bring such proceedings in the name of Texas General Underwriters, or in his own name as Attorney-in-Fact, for subscribers at Texas General Underwriters."

The principal authorities cited by appellant in support of his contention are: Glenn H. McCarthy, Inc. v. Southern Underwriters, Tex.Civ.App., Austin, 192 S.W. 2d 469 (Writ Ref. N. R. E.) and Knox v. Andrus, La.App., 38 So.2d 804.

Appellee's contention that those reserves are a liability is partly predicated on the provisions in the subscribers agreement that "This agreement may be cancelled only in accordance with the cancellation provisions of Indemnity contracts issued to us as a result hereof," which provisions are: "If the named insured cancels, earned premiums shall be computed in accordance with the customary short rate table and procedure. If the company cancels, earned premiums shall be computed pro rata. Premium adjustments may be made at the time cancellation is effected, and, if not then made, shall be made as soon as practicable after cancellation becomes effective. The company's check or the check of its representative mailed or delivered as aforesaid shall be a sufficient tender of any refund of premium due to the named insured."

This right of cancellation and reimbursement for unearned premiums is, however, subordinate to the obligation to keep the advance premium deposit intact for the purpose of paying losses and expenses of the Exchange incurred during the contract period. Glenn H. McCarthy v. Southern Underwriters, supra.

Appellee cites the case of Wilson v. Marshall, Tex.Civ.App., San Antonio, 218 S.W. 2d 345, 346, which describes the relationship of subscribers to an insurance exchange, such as Underwriters, in this language: " 'The subscribers at a reciprocal exchange are not only policyholders thereat and as such entitled to the protection afforded by the policies and required to pay the premiums stipulated in the policies; but they also own the insurance business just as stockholders own their corporation.

They are the owners of their insurance exchange, and as such are entitled to reap the profits accruing from the operation of their insurance business and are also required to pay their pro rata part of the losses and expenses incurred at the exchange. It is their liability to pay their pro rata part of the losses and expenses that take the place of the capital structure of the exchange. When called upon to pay an assessment for his pro rata part of the losses, the subscriber at the exchange stands in the position of a stockholder in a stock insurance company whose capital structure has become depleted and who is required to pay a certain amount on each share of stock he owns into the coffers of the company to remove the deficit.' "

From this premise appellee argues "it is the universal accounting practice to carry capital stocks as a corporate liability even though stockholders cannot demand the return of any part of same until all corporate debts are paid."

We do not question that such is a proper accounting practice. Certainly, in making up a profit and loss statement for a corporation, its capital stock is a liability. We find, however, that in determining the solvency of a corporation under the Federal Bankruptcy Act, 11 U.S.C.A. § 1 et seq., that this liability is not taken into account. We quote from 8 C.J.S., Bankruptcy, § 72, p. 488: "The test for determining the solvency of a corporation is whether or not its assets, fairly valued as of that date, are in excess of its liabilities, disregarding liability to stockholders, either preferred or common, since the lawmakers had in mind such an insufficiency of assets that nothing is left for distribution to the stockholders as such. * * *. Unpaid subscriptions of stock of the corporation, the right to enforce it being inherent in the corporation, may be counted as assets; * * *."

The word "assets" is generally defined as being the entire property of a person or corporation applicable or subject to the payment of his or its debts.

The fund in question is such property because of its express dedication to such purpose by the written agreement of the subscribers and because our courts have so held. McCarthy case, supra.

If this reserve is an asset then it cannot be a liability because "assets" is the antithesis of "liability."

In support of his contention that this fund is a liability, appellee cites the cases of Hardware Mutual Fire Insurance Co. v. Stinson, 210 N.C. 69, 185 S.E. 449 (North Carolina) and Republic Insurance Co. v. Highland Park Independent School District, 129 Tex. 55, 102 S.W.2d 184.

The question in North Carolina case was whether unearned insurance premiums were taxable under the Constitution and statutes of that state. The Court in holding that unearned premiums are a liability and not taxable said: "We see no reason why the statutes in this state should be nullified." [210 N.C. 69, 185 S.E. 454.]

Similarly the Republic case, supra [129 Tex. 55, 102 S.W.2d 193], was a tax case. It did not involve an insurance exchange, as here, nor any subscriber"s agreement; it merely held that a statute exempting reserves (construed to be reinsurance or unearned premium reserves) from taxation was valid. The Court, after reviewing various statutes, said:

"* * * We are of the opinion that the Legislature has since 1875 affirmatively recognized that unearned premiums are not to be regarded as assets of a fire insurance company. Article 5036 contains, in substance, the provisions of a similar statute enacted in 1875. This article prohibits the making of dividends by a fire insurance company except from profits of the company. It is then provided that in estimating such profits there shall be reserved therefrom a sum equal to 40 per cent. of the amount received as premiums on unexpired fire risks and policies, which amount so reserved is declared to be 'unearned premiums.' We think this a legislative declaration that these unearned premiums are not to be regarded as property of the company, but are to be regarded as belonging to policyholders for the future protection, stability, and satisfaction of their policies.

"* * * The question is not one primarily of exemption of property from taxa-

tion, but is the fixing of a standard of valuation of personal property for taxation. In light of the fact that these reserves are required by law for the protection of policyholders, and in reality constitute the very basis upon which the stability and solvency of insurance companies depend, and in view of the further fact that they unquestionably represent a fund held in trust for the protection of policyholders, which fund, potentially at least, may be completely appropriated to payment of liabilities, certainly justify the Legislature in classifying them as deductible indebtedness. * * *"

We have been cited to and have found no cases which we consider to be directly in point.

In the Knox v. Andrus case, supra [38 So.2d 805], a receiver of an insurance exchange brought suit to recover advance premium deposits which had been returned to a subscriber. In its opinion holding for the receiver the Court said: "'The advance deposit due by Mr. Andrus under the application was $250.00, which he paid to the agent which issued and delivered the policy to him, and which agent in turn paid the Southern Underwriters. The terms for which Mr. Andrus was insured under that original agreement was from September 7, 1937, to September 7, 1938, a term of one year. The Southern Underwriters was insolvent from December 31, 1936 to July 20, 1938, and was placed in the hands of a receiver, at which time there were claims against the Southern Underwriters of $114,148.83, and the only assets of the Southern Underwriters were $6,792.42, *and that the advance deposits referred to above amounted to $249,161.96. Hence these deposits had they been maintained would have prevented the insolvency of the Southern Underwriters,* and since they were not maintained by the Southern Underwriters, the receiver was authorized to institute suits against the subscribers for the amount. See Glenn H. McCarthy, Inc. v. Southern Underwriters, Tex.Civ.App., 192 S.W.2d 469, for a statement of the facts from which the foregoing is taken.'" (Italics ours.)

The italicized statement is, perhaps, dictum but it, nevertheless, is a judicial declaration of a highly respected court.

Article 19.07 (Ins. Code, supra) authorizes the attorney in fact for an exchange, such as Underwriters, to advance it money necessary for the purpose of its business and to enable it to comply with any requirement of law repayable "only out of the surplus remaining, after providing for all reserves, other liabilities and required surplus, and shall not otherwise be a liability or claim against the exchange or any of its assets."

Clearly a claim for a sum so advanced by an attorney in fact could not be used to establish the insolvency of the exchange. The purpose of such advance is necessarily in order to enable the exchange to continue in business and escape insolvency.

The reserve for unearned premium deposits is of a similar nature. It is to be used only for the purpose of paying claims against and expenses of the exchange and the subscriber's right to a return of any of his deposits is contingent upon the payment of all claims and expenses.

We do not believe that a fund created and maintained for a purpose in avoidance of insolvency can be shifted so as to weigh in favor of insolvency.

We, therefore, conclude that insolvency, as pleaded by appellee, has not been shown.

In view of this holding and the concession of appellee, quoted above, we need only determine, insofar as appellee is concerned, whether or not insolvency of the exchange is a prerequisite to the levy of the assessment which he seeks.

Section 4, Article 19.03 (Ins.Code) provides, in part, that a subscriber's contract shall provide "that such subscribers shall be liable, in addition to the premium or premium deposit specified in the policy contract, to a contingent liability equal in amount to one (1) additional annual premium or premium deposit."

Appellee emphasizes that this statute does impose the condition of insolvency as a condition precedent to such liability.

Neither, may we say, does such statute define or prescribe the contingency upon the happening of which such liability becomes absolute.

It is of special and strong significance, we believe, that in every Texas case, including this one, brought to enforce such contingent liability has the insolvency of the exchange over a definite period of time been the basis upon which liability of subscribers to the exchange during such period, was established.

Insolvency may not be the only contingency upon which such statutory liability may be invoked but it is the only one which has ever been used in this State, is the only one which readily comes to mind, and is the one pleaded in this case.

We are certain that such liability cannot be arbitrarily imposed and unless a necessity exists for its imposition the action in so doing would be arbitrary.

In considering the question before us we have reverted to the old so-called "double liability" of stockholders in a corporation under former Article 16, Sec. 16, of our Constitution, Vernon's Ann.St., which, in part, provided: " '* * * Each shareholder of such corporate body incorporated in this State, so long as he owns shares therein, and for twelve months after the date of any bona fide transfer thereof shall be personally liable for all debts of such corporate body existing at the date of such transfer, to an amount additional to the par value of such shares so owned or transferred, equal to the par value of such shares so owned or transferred.' "

This language is a paragon of clarity compared with the vague provision of the statute with which we are dealing, yet, it too, required construction.

In the case of Pool v. Chapman, Tex. Com.App. (opinion adopted by Supreme Court), 283 S.W. 762, 764, the Court gave the following construction to such constitutional provision and the statutes enacted under it, which we consider persuasive here:

"This is a statutory liability against Pool. Beginning with the early case of State v. Williams, 8 Tex. 265 [255], our Supreme Court has always held that one trying to enforce such a liability must plead his case with a great degree of certainty. In fact, it is held that the certainty must be of the same degree as would be required in a bill of indictment. Of course, there must be some proof to sustain the necessary pleading. * * *

"The debts referred to in the Constitution are debts in excess of the assets of the bank. * * * A stockholder is liable for such debts only as the assets of the bank will not pay. * * * But there certainly must be proof that debts in excess of the assets existed in the judgment of the commissioner when the former stockholder sold his stock before he can be held liable. If the bank does not owe debts in excess of its assets, there is no reason why a stockholder should ever be assessed.

" * * * The lawmakers of Texas evidently did not intend that a stockholder, realizing his bank was already insolvent, should relieve himself of the liability attaching to his stock by selling out shortly before the crash finally comes. *But it is equally certain that it was not the intention of the lawmakers to require a stockholder, who sells his stock while the bank is solvent, to pay an assessment on the stock he once owned just because the bank became insolvent after he had disposed of his stock. It is only where the insolvency of the bank relates back to the time when the former stockholder owned his stock that there can be any liability.* There could certainly be no presumption of insolvency at the date of the transfer of stock when it is not even shown that any debts existed at that time in excess of its assets." (Italics ours.)

We do not believe that the statute and agreement under consideration, insofar as the present question is concerned, to be more onerous on a subscriber at an insurance exchange than the above constitutional provision was held to be on a stockholder in a corporation.

Subscription agreements made at the exchange have fixed expiration dates. When such date arrives the relation cre-

ated by the agreement ceases to be and while a subscriber still bears a contingent liability to the extent stated, he is no longer a subscriber. His subsequent amenability to contingent liability must be referable to the time when he was a subscriber.

We do not believe that the intention of the Legislature nor of the parties to the subscription agreement can be fairly interpreted otherwise.

Appellee cites the cases of Commonwealth ex rel. Schnader v. Keystone Indemnity Exchange, 335 Pa. 333, 6 A.2d 821, and Keystone Indemnity Exchange v. Cappelli, 34 Del. Co. Rep. 456, as being opposed to the conclusion which we have just stated. We have read the Schnader case but have not had access to the Cappelli case.

The facts are not fully shown in the Schnader case but it is conceded that the language of the opinion is opposed to the construction which we have placed on our statute. We do not believe that the holding in that case is in harmony with what we consider to be the better reasoning of our own courts.

Decision of all other questions, briefed by the parties is, in view of the foregoing, unnecessary.

The judgment of the trial court is reversed and this cause remanded for further proceedings consistent with this opinion.

Reversed and remanded.

On Motion for Rehearing.

Appellee has filed a most astounding motion. He directs very little criticism, if any, towards the disposition which we made of the two questions decided in our original opinion. Rather, appellee argues, and for the first time, that we have proceeded upon a false premise, saying: "Appellee respectfully submits that the basic error contained in the opinion of this Honorable Court is the Court's assumption that the sums paid as advance premium deposits were the advance deposits mentioned in the subscribers' agreement or could be treated as if they were such advance deposits."

The motion further states:

"Under this Court's assumption, the balance remaining in the 'reserve for unearned premium deposits' was a sum which had been dedicated by the policyholders and which the reciprocal was obliged to refund only if such sum was not needed to meet the reciprocal's obligations. *In fact and at law, the 'reserve for unearned premium deposits' was a sum which the reciprocal was absolutely obligated to repay to its policyholders, and it was in no way dedicated to the payment of the reciprocal's other obligations.* * * *

"If the distinction between an 'advance deposit' and an 'advance premium deposit' is blurred or ignored, Appellant's arguments in this case have a specious plausibility and bear the surface appearance of being supported by the decisions in the two Southern Underwriters cases. By the use of such arguments, Appellant has obtained from this Honorable Court an opinion which can be sustained only if the provisions in the subscribers' agreement with respect to 'advance deposits' can be deemed to prevail over the treatment which the statutes of this State provide for 'advance premium deposits.' * * *

" * * * it is abundantly clear that neither the subscribers nor the reciprocal did anything more about the subject of 'advance deposits' than to make a single and fragmentary mention of such deposits in the subscribers' agreements. Perhaps this portion of the subscribers' agreement was blindly copied from an agreement of a reciprocal such as Southern Underwriters which actually used true 'advance deposits.' Perhaps the subscribers to Texas General Underwriters actually intended to use 'advance deposits' and to hold them intact, but later discarded the idea and didn't put it into practice. One can only speculate with respect to matters such as these. However, certain it is from the evidence that the reciprocal never did collect 'advance deposits'; * * *."[1]

1. All italics ours.

Let us examine the record.

Mr. Toepperwein, appellees' auditor, testified:

"* * * Now, what do you mean * * * what does that include, that reserve for unearned premium deposits? Exactly what is it. A. That is the unearned premiums or rather the unearned portion of those premium deposits from January 31, 1946, to the expiration date of all of the policies."

The subscribers' agreement provides:

"* * * our liability, in addition to the premium or premium deposit specified in the contract, shall be limited to one additional annual premium or premium deposit.

"* * * We agree to keep our Advance Deposit intact as a Surplus for the payment of our proportion of losses and expenses, and to pay promptly all demands for monies to be used * * *."

Every policy issued by the Exchange contained these provisions:

"Limit of Liability: The liability of each member of this Exchange is limited to, and by its Articles of Agreement fixed and determined to be the deposit premium or paid premium; the member, by accepting this policy, assumes a contingent liability not exceeding the amount of deposit premium or premium named in the policy, which amount shall not exceed one annual premium. * * *

"26. Special definitions and provisions—plan of operation. Wherever the words policy, insured, company and *premium* occur herein, they shall be taken and construed to mean contracts, subscriber, reciprocal or inter-insurance exchange and *deposit* respectively."

Appellee in his pleading against appellant in this case alleged:

"Plaintiff further alleges that notwithstanding the fact that the Defendant Pacific Finance Corporation had knowledge of, or was charged with, the provision of the Subscriber's Agreement that provided that the subscriber would keep his advance deposit intact for the purpose of paying the proportionate part of the losses of such subscriber, the Defendant Pacific Finance Corporation did cause the Attorney-in-Fact of Texas General Unnderwriters, J. Rosenstock, and his agents Rolan C. Kennell and A. V. Cross, Jr., (the said Rosenstock being the Attorney-in-Fact of the defendant Pacific Finance Corporation and the agents Kennell-Cross being the agents of the Defendant Pacific Finance Corporation), *to return to the Pacific Finance Corporation large sums of money as return premiums which were required under the Agreement to be kept intact for the purpose of paying the losses of the exchange and that such acts on the part of the Defendant Pacific Finance Corporation were a fraud upon the creditors of Texas General Underwriters, which creditors are here and now represented by the Plaintiff.* * * *

"This Plaintiff further alleges that if J. Rosenstock, Attorney-in-Fact at Texas General Underwriters, and Roland C. Kennell and A. V. Cross, Jr., had knowledge of the manner in which Pacific Finance Corporation operated with reference to the various and sundry insurance policies, that since J. Rosenstock was the Attorney-in-Fact of the Pacific Finance Corporation and Rolan C. Kennell and A. V. Cross, Jr., were agents of J. Rosenstock, such knowledge was merely the knowledge of the Defendant Pacific Finance Corporation and could in no manner be imputed to the creditors of Texas General Underwriters, and *the Defendant Pacific Finance Corporation is here and now estopped to plead its illegal act in securing from Texas General Underwriters, * * * return premium which was required by the contract of insurance to be kept intact for the purpose of paying losses, as against the rights of creditors.*"

The judgment in this case decreed:

"* * * in addition thereto Pacific Finance Corporation and said owner became primarily liable, jointly and severally to keep intact as a surplus its or his advance deposit herein referred to; * * *

"The Court finds and concludes that each of the subscribers at Texas General Underwriters * * * was an insurer and an insured, and that each subscriber thereby became liable to keep his advance deposit

162

intact for the purpose of paying his proportionate part of the losses and expenses and became liable to pay his or its proportionate part of all losses and expenses of the whole indemnity granted by the subscribers at Texas General Underwriters, and the Attorney-in-Fact was authorized and directed to pay out of the funds deposited with him by each and all of the subscribers his or its proportionate part of the cost of exchanging indemnity, including the claims and demands made against such exchange, in an amount equal to the advance deposit and one additional annual premium or deposit premium prorated during the period of time the policy was in force during the insolvency period.

"(45) The Court finds and concludes that the policyholders at Texas General Underwriters during the period from January 31, 1946 to January 27, 1947, inclusive, failed to keep their advance deposits intact for the purpose of paying their proportionate part of the losses and expenses and are liable for an assessment for an amount equal to the advance deposit which they had agreed in the Subscriber's Agreement to keep intact for the purpose of paying his proportionate part of the losses and expenses, which they had failed to do, and in addition thereto, * * *

"(46) *The Court further finds and concludes that the advance deposit of the policyholders and subscribers at Texas General Underwriters herein referred to is the amount shown in the policy as 'written premium' in that the policy provided that whenever the word premium was used, the same should mean deposit, and because the uncontroverted evidence in this case shows that the subscribers deposited said 'written premium' deposit with the Attorney-in-Fact and his agents, R. C. Kennell and A. V. Cross, Jr., at about the time of the issuance of each of said policies, and such deposit was the only deposit required to be made and was the only deposit actually made, and further, the Texas General Underwriters Exchange required its subscribers to make advance deposits."*

In Glenn H. McCarthy, Inc. v. Southern Underwriters, Tex.Civ.App., 192 S.W.2d 469, 471, the Court said: "We think it is clear from the foregoing agreement, if taken alone, that it was the purpose of the exchange and of the subscribers, through their deposits, to provide a sufficient fund to not only meet estimated costs of such insurance; but also, through keeping 'our advance deposits intact' to thereby provide, in addition to the contemplated needs, a surplus to pay any losses or expenses that might be incurred within the terms of the contract. Such surplus, therefore, is in addition to the actual insurance costs contemplated, and is designed to cover unanticipated losses. If appellants' construction of the contract be correct, then no such surplus could ever be available. In support of it they rely upon certain provisions of the policy relating to what the policy designates as 'premiums'. However, the policy itself provides that wherever the term 'premium' is used 'it is a term of convenience used to designate the deposit made by the subscriber for the purpose of exchanging indemnity as herein contemplated, * *.'"

Yet in spite of these pleadings and judgment, in the very face of the provisions of the policies and agreements and directly opposed to the holding of this Court in the McCarthy case, appellee blithely asserts that we have misconceived the nature of the fund involved. Our disagreement with this assertion, under this record, is manifest.

We disclaim any intention of departing, in any degree, from our decisions in Howell v. Knox, Tex.Civ.App., 211 S.W. 324 (Writ ref. N.R.E.), and Archie v. Knox, Tex.Civ. App., 224 S.W.2d 504 (Writ ref. N.R.E.), relating to the standard of insolvency for a reciprocal insurance exchange. The question of whether the reserve for unearned premiums or advance deposits constitute "reserves" within the meaning of Article 19.06 of the Insurance Code is not before us because appellee has made no effort to calculate the amount of such "reserve" under the formula set out in Article 6.01 of the Insurance Code, which article he contends is applicable.

The motion is overruled.

Motion overruled.